IN THE UNITED STATES DISTRICT COURTS
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

EMILY HALE  o/b/o                                                                    PLAINTIFF
S.C.H.

      v.                                         CIVIL NO.13-2252

CAROLYN W. COLVIN,[1] Commissioner
Social Security Administration                                          DEFENDANT


**MEMORANDUM OPINION**

     Plaintiff brings this action on behalf of S.C.H., a minor child, seeking judicial review pursuant to 42

U.S.C. § 405(g), of the decision of the Commissioner of the Social Security Administration (Commissioner),

denying A.B.'s application for child's supplemental security income (SSI) benefits under Title XVI of the

Social Security Act.

**I.  Background**

     Plaintiff filed an application for SSI on S.C.H.'s behalf on November 2, 2010. (Tr. 108.) Plaintiff

alleged that S.C.H. was disabled due to Asthma, and ADHD Combined Type. (Tr.135.)  An administrative

hearing was held on May 18, 2012 in front of Administrative Law Judge ("ALJ") Harold D. Davis. (Tr. 27.)

Plaintiff and S.C.H. were present and represented by counsel. (Tr. 28.)

     The ALJ, in a written decision dated August 3, 2012, found that although severe, S.C.H.'s history of

Asthma and ADHD did not meet, medically equal, or functionally equal one of the impairments listed in 20

C. F. R. Part 404, Subpart P, Appendix 1. (Tr. 14.)  He concluded that S.C.H. had less than marked limitation

in the domain of "attending and completing tasks," and no limitations in the other domains.  (Tr. 18-21.)

---

[1] Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013. Pursuant to Rule
25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner
Michael J. Astrue as the defendant in this suit.

On September 26, 2013, the Appeals Council declined to review this decision. (Tr. 1.) Subsequently, plaintiff filed this action. (ECF No. 1.)  Both parties have filed appeal briefs, and the matter is now ready for decision.

## II.  Standard of Review

The Court's review is limited to whether the decision of the Commissioner to deny benefits to the plaintiff is supported by substantial evidence on the record as a whole.  *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996).  Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Richardson v. Pearles*, 402 U.S. 389, 401 (1971).  The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision.  *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996).

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924.  Under this most recent standard, a child must prove that she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(c)(I); 20 C.F.R. § 416.906.

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps.  This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

2

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments.  More specifically, a determination that a child is disabled requires the following three-step analysis.  *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(b).  If the child is so engaged, he or she will not be awarded SSI benefits.  *See id.*  Second, the ALJ must consider whether the child has a severe impairment.  *See* 20 C.F.R. § 416.924(c).  A severe impairment is an impairment that is more than a slight abnormality.  *See id.*  Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. § 416.924(c).  Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act.  *See* 20 C.F.R. § 416.924(d).  Under the third step, a child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment.  20 C.F.R. § 416.926(a).  To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains.  *See* 20 C.F.R. § 416.926a(b)(1).  The six domains are:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings.  *See* 20 C.F.R. § 416.926a(d).  A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme."  A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities.  *See* 20 C.F.R. § 416.926a(e)(2).  An extreme limitation is defined as "more

than marked," and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or complete activities. Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *See* 20 C.F.R. § 416.926a(e)(3).

**III. Discussion**

Plaintiff raises two issues on appeal: 1) the ALJ erred when found that S.C.H. met Listing 112.11; and 2) the ALJ erred in discounting Plaintiff's subjective complaints as not credible. (Tr. )

**A.      Listing 112.11**

Under Childhood Listing 112.11, Attention Deficit Hyperactivity Disorder is "[m]anifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity."

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented findings of all three of the following:
      1. Marked inattention; and
      2. Marked impulsiveness; and
      3. Marked hyperactivity;
and

B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02 or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

The age-group criteria for Paragraph B2 of 112.02 are as follows:

a. Marked impairment in age-appropriate cognitive/ communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

4

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

In this case, Plaintiff has been diagnosed with ADHD and is receiving treatment for this condition. (Tr. 227, 286, 288,  ) However, as Defendant accurately points out in his brief, "[t]he record presents two fairly distinct accounts of Plaintiff's behavior and ability to function in an age appropriate manner." (Def's Br. at 6.) A review of the record reveals that the reports from Plaintiff's teachers, his school learning records, standardized test scores, and the majority of the physician impressions diverge sharply from that of Plaintiff's mother and the Mental Health RFC provided by Dr. Livingston of Vista Health Outpatient Services.

Plaintiff's kindergarten teacher, Ms. Gina Broyles, completed a teacher questionnaire on November 11. 2010. (Tr. 148.) She had Plaintiff for about six hours per day. (Tr. 141.) She indicated that Plaintiff had no issues other than in the domain of interacting and relating with others. She noted slight problems with playing cooperatively, making and keeping friends, expressing anger appropriately, following rules, and respecting/obeying adults. (Tr. 144.) She noted that she changed Plaintiff's seat assignment to decrease conflicts, and said he required "occasional time-outs/notes home." (Tr. 144.) In her summary she stated "I know that his parents started him on medication about a month ago. It has seemed to help with his social skills/cooperation. We were also seeing some confusion with reality before and this has improved lately, too." (Tr. 147-48.)

Plaintiff's school record for kindergarten indicated that he had the highest of three levels of learning ("developed") for all areas except attentive behavior, where he received the middle score of "developing." (Tr. 206.)

Plaintiff's first grade teacher, Ms. Kristin Mendez,  has Plaintiff the entire school day for all subjects. She indicated that Plaintiff had no problems in the domains of acquiring and using information, attending and completing tasks, and moving and manipulating objects. She indicated that he had slight problems in the domain of interacting and relating with others regarding the activities of playing cooperatively with others and expressing anger appropriately. She also noted slight problems in the domain of caring for himself and others regarding the activities of handling frustration and being patient. The only obvious problem noted was making and keeping friends. She noted that the school had implemented behavior modification strategies "per <u>parent</u> request not school request." (Tr. 187.)(emphasis in original.) Her summary was as follows: "[Plaintiff] has counseling here at school for making friends, being a good friend, and outsourced counseling for other issues because mom has requested it. But I see no inappropriate behavior besides friendship issues." (Tr. 191.)

Plaintiff's school records for first grade indicate that he was "meeting or exceeding standards" on all of his subjects, except for second quarter art, where he received an "approaching standards" score.  (Tr. 212.) A parent/teacher conference was noted in the first quarter, while the notation "great job" appeared with a smiley face for the second quarter. (Tr. 214.) On his standardized test score for the Iowa Tests of Basic Skills, Plaintiff scored in the 83rd percentile for Vocabulary, 91st percentile for Reading:Words, 97th percentile for Language, and 99th percentile for Mathematics. (Tr. 215.)

In a meeting with Plaintiff's outpatient counselor in September 2011, the school counselor stated that she " doesn't see that the [Plaintiff] has any major problems at school. She doesn't see any of the anxiety in class that mom reports he complains about. She feels the client struggles a little socially but he manages just fine in the classroom." (Tr. 417.)

Plaintiff underwent a pediatric consultative examination by Dr. Rosenschein on January 4, 2011. He stated that "child acts and behaves like a normal 6 y[ear] old boy." His impression was "normal for exam" and "normal for age." (Tr. 226.)

6

Plaintiff underwent a psychiatric consultative examination by Dr. Robert Spray on February 16, 2011. (Tr. 227.) He diagnosed him with ADHD by history, and "at least partial remediation with medication,"  and assigned a GAF of 65-75 with medication. (Tr. 230.) He found his capacity to communicate adequate. Regarding his ability to cope with work-like tasks, he stated "This child is functioning in the average to high average range of intelligence. He is being treated for ADHD, and test scores and behavior during the exam suggest his medication is serving him well." Attention and concentration were normal with medication, he "persisted well on his medication," and his pace was average to high average. (Tr. 231.) He assessed Plaintiff with a Full Scale IQ of 110 on the Wechsler Intelligence Scale for Children-IV. (Tr. 229.)

Plaintiff presented to the Sophia Meyer Clinic for headaches and respiratory symptoms between December 2011 to April 2012. (Tr. 274-98.)

Plaintiff was treated for eight sessions of neurofeedback for migraine and outbursts by Dr. Chambers. Treatment notes were dated January and February 2012. This treatment was reported to not be helpful.  (Tr. 264-66.)

Plaintiff was referrer to Lowell Neurology Clinic at Arkansas Children's Hospital for headache and neck pain where he was seen by Dr. Balmakund on March 15, 2012. (Tr. 339.) According to the history, Plaintiff had been complaining of headaches 2-3 times per week for the last six months. (Tr. 339.) His CAT scan was normal, examination was nonfocal, and "developmentally, the child looks okay." (Tr. 341-42.) Dr. Balmakund 's impression was that this was a supratentorial lesion, possibly vascular. His diagnosis was headache, possible migraine; normal neurological examination; history of anoxic episode at birth. (Tr. 341.) He prescribed medication prophylactically, and stated that he usually does this for six months to a year and then discontinues the medication. He indicated that the medication would also help the Plaintiff to sleep and help control his allergies as well. (Tr. 342.) He noted that "I would not recommend further studies." (Tr. 342.)

AO72A
(Rev. 8/82)

A Childhood Disability Evaluation form was completed by non-examining Agency Physician Dr. Manley in March 2011. Dr. Manley found that Plaintiff's impairments were severe, but did not equal the Listings. (Tr. 234.) Dr. Manley noted less than marked limitation in the domain of interacting and relating with others and none in the other domains.(Tr. 236.)  A second Childhood Disability Evaluation form was completed by non-examining Agency Physician Dr. Whaley on November 2011. Dr. Whaley found that his impairments of ADHD and Asthma were not severe, noting that his ADHD was well controlled by medication and his asthma showed minimal morbidity and he takes maintenance medications. (Tr. 258.)

Plaintiff goes to Vista Health Outpatient Services for counseling for his ADHD. On July 7, 2011, progress notes indicate that Plaintiff reported hearing voices telling him to do bad things. The counselor noted that the abusive dad  had just left the house and now the older brother was becoming the abuser. The counselor also noted that Plaintiff had been out of care with them for nearly five months. (Tr. 253.) A diagnosis of Psychosis, NOS was added to his file on July 28, 2011. (Tr. 251.) On August 10, 2011, his diagnosis returned to ADHD alone. (Tr. 252.) On October 25, 2011, his diagnosis again stated ADHD and Psychosis, but Plaintiff reported that the voices were "going away."  (Tr. 273.) His most recent progress report from Vista is dated March 23, 2012. (Tr. 267.) His diagnosis was ADHD, and Plaintiff stated he was "good."

Dr. Richard Livingston of Vista competed a Medical and Functional Capacity Assessment (Child) on September 18, 2011. (Tr. 331-37.) Dr. Livingston indicated a diagnosis or ADHD, Psychosis NOS, and Asthma. (Tr. 331.) He indicated that Plaintiff had developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity, with marked levels of all three. He indicated marked impairment for cognitive/communicative function and wrote in "school" beside that category, marked impairment in social functioning, and marked difficulties in maintaining concentration, persistence, or pace. (Tr. 332-33.) For the domains of functioning, he indicated "none to slight" impairment for moving and manipulating objects and health and physical well-being. He indicated moderate impairment for interacting and relating with

others and caring for self. He indicated marked impairment for attending and completing tasks. (Tr. 335-37.)

At the hearing on May 18, 2012, Plaintiff's mother testified that he can't even sit still long enough to eat dinner, and when he helps her fold laundry he'll take off after folding two or three towels. (Tr. 39.) She testified that his first grade teacher had to send Plaintiff to the office several time and started calling her about behavior problems with Plaintiff about a week after the teacher had filled out the form for SSI. (Tr. 41.) She testified that he was still hearing voices, and that Vista thought it might be childhood schizophrenia which is "very rare so they're wanting to give it more time." (Tr. 42.) She testified that one of the voices tells him to kill his older brother. (Tr. 42.) She testified that she called the police on her older son for beating up on Plaintiff. (Tr. 44.) She testified that he is very dramatic at home, crying, and getting in fights with bigger kids if he goes outside by himself. (Tr. 46-47.)

On September 18, 2011, Plaintiff's mother reported to a Vista counselor that Plaintiff was having a "a lot of anxiety and trouble at school, however, teachers and staff don't see any of that." She reported that he cries excessively. (Tr. 417.) At the consultative examination with Dr. Spray, Plaintiff's mother reported that "[w]ithout his medication, he is very hyper, and cannot sit still, and has outbursts of talking and screaming. He gets frustrated dressing himself. He is impulsive, and has difficulty staying with a specific activity. He tends to be uncooperative, defiant, and impudent." (Tr. 227.)

Plaintiff told the ALJ that he liked school and his teacher. (Tr. 50.) When asked about attending a school summer program, the counselor reported that he "thought it would be fun." (Tr. 389.)

Vista counselors spoke with Plaintiff's teacher several times in 2011 and 2012. In their reports, they indicated that the teacher stated that he could be talkative and disruptive "at times" and had gotten into trouble once on the playground by bossing and hitting two other children. (Tr. 390, 392, 393, 400, 410.) They also reported that the teacher thought his medication was making him "a zombie" at one point, but noted that a change in medication helped that. (Tr. 411.)

AO72A
(Rev. 8/82)

There are several notations in the Vista records about a dysfunctional home life, including domestic violence by the stepfather and an abusive older brother, at one point describing Plaintiff as "merely the loudest symptom of a broken system, in which now the older brother is becoming the abuser." (*See e.g.* Tr. 252, 253, 395, 396, 397, 398.) Plaintiff's mother was interested in the school summer program to "give him a break from his brother." (Tr. 388. )

Thus, the only support in the record for Listing Level impairment comes from Dr. Livingston's Capacity Assessment and Plaintiff's mother. The ALJ found that Dr Livingston's Assessment was "not consistent with the other credible medical evidence of record" and weighed it accordingly. (Tr. 21.) He also found that Plaintiff's mother was not entirely credible, as discussed below. (Tr. 22.) After carefully reviewing the record this Court finds that the ALJ's treatment of Dr. Livingston's Evaluation and his finding that Plaintiff's ADHD did not meet Listing severity is supported by substantial evidence.

In order to reach Listing severity, Paragraph B2 of 112.02 requires that a child show marked impairment in at least two of the four categories of cognitive communicative function, age-appropriate social function, age-appropriate personal functioning, and maintaining concentration, persistence, or pace. In this case, Dr. Livingston assigned marked difficulties for all categories except personal functioning.

However, Dr. Livingston's assessments of marked impairment for cognitive/communicative function and the ability to maintain concentration/persistence/pace are not congruent with the rest of the record. Indeed, Plaintiff's excellent school progress reports, positive teacher and school counselor comments regarding his academic performance, standardized test scores in the 83rd to 99th percentiles, and an IQ score of 110 directly rebut these assessments. Pursuant to Paragraph B2(a) of 112.02 , information from those who know the child and data from appropriate standardized psychological tests are appropriate criteria to use in evaluating the existence of marked impairment. Therefore, the ALJ did not err in relying upon these sources of information over a physician assessment that was incongruent with the majority of Plaintiff's records from other sources. *See Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005)

10

(a treating physician's opinion will only be given controlling weight when it is " well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.")

Further, Dr. Livingston's assessments are also not congruent with the consultative examiners in the case, particularly that of Dr. Spray, who administered the Wechsler Intelligence scale. It does not appear that Dr. Livingston administered or referenced any psychological instruments to assess Plaintiff's functional capacity, including his cognitive capacity. Therefore the ALJ did not err in giving it little weight. *See Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (an ALJ may discount or even disregard the opinion of a treating physician when other medical opinions in the record are supported with better medical evidence).

Dr. Livingston's assessment of marked impairment for social functioning has somewhat better support in the record. However, the statements of Plaintiff's teachers do not support the same level of impairment, with both teachers indicating only "slight problems" in this area. Given that Listing 112.00 (c)(3) specifically advises that teachers are a good source of first-hand social function knowledge for primary school children, the ALJ did not err in relying on the input from Plaintiff's teachers over that of Dr. Livingston.

### B.    Credibility of Plaintiff's Mother

In order to assess credibility, the ALJ must consider several factors when evaluating a claimant's subjective complaints of pain, including claimant's prior work record, observations by third parties, and observations of treating and examining physicians relating to 1) the claimant's daily activities; 2) the duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Casey*, 503 F.3d 687, 695 (8th Cir.2007) (citing *Polaski v. Heckler*, 729 F.2d 1320, 1322 (8th Cir.1984). In discrediting a claimant's subjective complaints, an ALJ is required to consider all available evidence on the record as a whole and is required to

11

make an express credibility determination. *Lowe v. Apfel,* 226 F.3d 969, 971 (8th Cir. 2000). However, the ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.2004). An ALJ's decision to discredit a claimant's credibility is entitled to deference when the ALJ provides "good reason for doing so." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001.)

In this case, the ALJ expressly stated one good reason, and clearly implied one other to support his findings that Plaintiff's mother was not entirely credible. The ALJ expressly noted that he had heard and considered the testimony and statements of  Plaintiff's mother, and found them to be "not entirely supported by credible medical evidence of record." (Tr. 22.) This is supported by the record. In his pediatric consultative examination, Dr. Rosenschein stated that Plaintiff acted and behaved like a normal six year old boy. He found Plaintiff to be normal for his age and that the examination was normal. (Tr. 7.) Neurologist Dr. Balmakund indicated a normal neurological examination result, administered some headache medication prophylactically, and did not recommend any further studies. (Tr. 342.) Consultative psychological examiner Dr. Spray stated that "[h]e is being treated for ADHD, and his test scores and behavior during the exam suggest his medication is serving him well." (Tr. 231.)

Implicit in his opinion, the ALJ also clearly found that Plaintiff's mother's testimony and statements were not supported by Plaintiff's teacher and academic performance records.  He expressly stated that "[t]he statements of the claimant's classroom teachers are given substantial weight due to the longitudinal history of daily observation of the claimant." (Tr. 22.) In analyzing each domain he referenced evidence from Plaintiff's teachers, and where appropriate, Plaintiff's academic performance in school and on standardized tests.  Finally, he expressly noted that first-grade teacher Ms. Mendez stated that Plaintiff was receiving counseling at school and outsource counseling "because the claimant's mother requested it although the claimant was not seen to have exhibited any inappropriate behavior in the classroom. . ." (Tr. 19.)This expressly points out an inconsistency between the mother's allegations and that of the school and

teacher.  A review of the record also indicates that Plaintiff's mother pursued behavior modification strategies in school for Plaintiff even though the school had not requested such modification.

It  would have been preferable if the ALJ had expressly inserted a sentence stating  that Plaintiff's mother's evidence was not supported by the Plaintiff's teacher or academic performance evidence. However, given the strength of the evidence and the clear implicit inconsistences between the mother's allegations and Plaintiff's teacher and academic performance records, this was a harmless error of opinion-writing in an otherwise very thorough review by the ALJ. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [the Plaintiff] must provide some indication that the ALJ would have decided differently if the error had not occurred.")

Finally, although not discussed the ALJ in his opinion, this Court also notes that the Vista  Health records indicate a five month gap in Plaintiff's treatment for ADHD. (Tr. 253.) *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem.")

**III. Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decisions, and thus the decision should be affirmed. The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.

DATED this 24th day of September 2014.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

13